UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                        Case No. 11-cr-20376
                                            Hon. Matthew F. Leitman

v.

MICHAEL GOINS,

      Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION
## FOR COMPASSIONATE RELEASE (ECF No. 23)

Defendant Michael Goins, a federal prisoner incarcerated at FCI Elkton, has filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). (*See* Mot. for Compassionate Release, ECF No. 23.)  For the reasons explained below, Goins' motion is **GRANTED**.  As described below, Goins shall immediately be released from custody at FCI Elkton to begin his term of supervised release, and the Court adds home confinement as a condition of his supervised release.

## I

## A

On January 12, 2012, pursuant to a Rule 11 Plea Agreement, Goins pleaded guilty to (1) possessing heroin with intent to distribute and (2) using and carrying a firearm during and in relation to a drug trafficking offense. (*See* Rule 11 Plea

Agreement, ECF No. 20, PageID.47.)  The Plea Agreement provided that Goins' sentencing guidelines range was 262–327 months imprisonment. (*See id.*, PageID.49, 58–61.)  That range was driven, in large part, by Goins' criminal history. Goins had previously been convicted of several drug offenses and for carrying a concealed weapon, and he qualified as a "career offender" under the guidelines. (*See id.*, PageID.48–49.)  In fact, Goins was on parole for a state drug conviction at the time he committed the federal offenses in this case, and the state authorities commenced parole violation proceedings against him based upon the same conduct underlying the federal charges in this case. (*See* Def.'s First Supp. Br., ECF No. 28, PageID.105; 4/12/13 Soles Letter, ECF No. 28-3, PageID.126.)

On June 20, 2012, United States District Judge Marianne Battani sentenced Goins to 97 months imprisonment for the heroin possession offense and to 60 months imprisonment for the gun offense; the sentences were to run consecutively for a  total of 157 months imprisonment. (*See* Judgment, ECF No. 21, PageID.66.) Judge Battani also sentenced Goins to a term of 36 months of supervised release on each count, to run concurrently. (*See id.*, PageID.67.)

**B**

It appears that Goins' aniticpated release date for his federal sentence is later than the parties and Judge Battani had intended.  As Goins explained in his motion – and as the Government candidly acknowledged during the hearing before the Court

– the parties appear to have assumed that (1) Goins' federal sentence (for his drug and firearm offenses) and his state sentence (for his parole violation) would run concurrently to one another and (2) the time that Goins spent in custody prior to his sentence would be credited toward his federal sentence. (*See* Def.'s First Supp. Br., ECF No. 28, PageID.106–107.)  These assumptions turned out to be wrong.  The Bureau of Prisons (the "BOP") appears to have determined that Goins was in state, not federal, custody prior to his sentencing, and it appears that the BOP thus did not credit Goins' pre-sentence detention toward his federal sentence.  And it appears that after sentencing, Goins was physically transferred to a state facility to complete his parole violation sentence, and it appears that the BOP did not credit Goins' time in that facility toward his federal sentence.

Had the BOP credited Goins' pre-sentencing detention and his time at the state facility toward his federal sentence, as the parties apparently assumed it would, then Goins' release date would be some time during the summer of 2022. (*See id.*, PageID.107.)  Instead, his current release date is April 4, 2024. (*See id.*)  The key point for the Court's purposes here is that Goins is within two years of the release date that the parties appear to have anticipated and has served approximately 80% of the time in custody that the parties intended for him to serve.

3

## C

Goins has worked to improve himself while in custody.  Goins earned his GED in 2014, and he has taken courses on job skills, financial literacy, and health. (*See id.*, PageID.118; Education Data, ECF No. 28-11, PageID.141.)  Goins has also participated in programming to prepare for his release. (*See* Def.'s First Supp. Br., ECF No. 28, PageID.118; Education Data, ECF No. 28-11, PageID.141.)  Moreover, Goins reports that he has asked to participate in drug treatment at FCI Elkton, but he has not yet been assigned to a program, and no programming is occurring during the current COVID-19 pandemic. (*See* Def.'s Resp. to Questions, ECF No. 36, PageID.253–254.)  Goins has, however, learned about how to "replac[e] negative drug-use habits with healthy activities" through other drug-related programming while incarcerated, and he intends to participate in community-based drug treatment upon his release. (*Id.*, PageID.254.)  To that end, Goins has compiled a list of Detroit-area drug programs he can participate in if he is released. (*See id.*)  Moreover, Goins has not had any disciplinary issues since he returned to federal custody after serving his parole violation sentence in state custody. (*See* Def.'s First Supp. Br., ECF No. 28, PageID.105; Discipline Data, ECF No. 28-12, PageID.142.)

## D

Goins' family has experienced significant tragedy while Goins has been incarcerated, and that tragedy has had a profound impact upon Goins.  In particular,

Goins' niece, who wrote to Judge Battani in support of Goins during his original sentencing (*see* Laird Letter, ECF No. 29, PageID.158), was brutally raped, tortured, and murdered in May 2019. (*See* Def.'s Second Supp. Br., ECF No. 31, PageID.166.) In addition, Goins' mother, brother, two sisters, and grandson all passed away while he was incarcerated. (*See* 4/5/20 Petition for Release, ECF No. 28-4, PageID.128; Def.'s Resp. to Questions, ECF No. 36, PageID.256; 6/4/20 Lakisha Goins Letter, ECF No. 38-1, PageID.637.)   Goins expressed remorse that he was incarcerated during his family's times of grief. (*See* 4/5/20 Petition for Release, ECF No. 28-4, PageID.128; Mot. for Compassionate Release, ECF No. 28, PageID.73.)

Goins' remaining family feels the same connection to him that he feels toward them.   His sister, Dianna Cann, and her son, Curtis Cann, have offered to permit Goins to live with them upon his release from custody. (*See* Def.'s Second Supp. Br., ECF No. 31, PageID.165–166.)   They have offered to permit Goins to spend his first fourteen days after his release in quarantine in their upstairs bedroom, which also has an attached bathroom. (*See* Def.'s Resp. to Questions, ECF No. 36, PageID.257–258.)   And Curtis Cann has offered to employ Goins in his auto repair and trucking business upon Goins' release. (*See* Def.'s Second Supp. Br., ECF No. 31, PageID.167.)   Finally, Goins' family members have written to the Court expressing their support for Goins and their commitment to helping him succeed upon his release. (*See* 6/4/20 Lakisha Goins Letter, ECF No. 38-1, PageID.637.)

**E**

Goins petitioned the BOP for compassionate release on April 5, 2020. (*See* 4/5/20 Petition for Release, ECF No. 28-4, PageID.128.)  The BOP denied Goins' request on May 4, 2020. (*See* 5/4/20 Denial Letter, ECF No. 28-5, PageID.129.)  The Government "does not contest" that Goins has administratively exhausted his request for compassionate release. (Gov't Second Resp., ECF No. 34, PageID.180.)

**F**

In his motion for compassionate release, Goins contends that he has two medical conditions that make him especially susceptible to a severe outcome (including death) if he contracts COVID-19.  First, Goins notes that he has suffered from hypertension since at least 2015. (*See* Def.'s First Supp. Br., ECF No. 28, PageID.115; Medical Records, ECF No. 28-6, PageID.130–140.)  On July 30, 2015 – the earliest available blood pressure reading in Goins' medical records produced so far – he had a left-arm blood pressure reading of 149/100 and a right-arm blood pressure reading of 152/100. (*See* Medical Records, ECF No. 37-6, PageID.600.) Those readings put him at Stage 2 hypertension. (*See* Def.'s Resp. to Questions, ECF No. 36, PageID.255.)  Goins takes Hydrochlorothiazide and Lisinopril to manage his high blood pressure. (*See* Def.'s First Supp. Br., ECF No. 28, PageID.115.)  His Lisinopril prescription is at the high end of regular dosages of Lisinopril for an adult. (*See id.*)  Even with these medications, however, Goins' most recent blood pressure

reading – 130/80 on November 13, 2019 – still puts him in the range of Stage 1 hypertension. (*See* Def.'s Resp. to Questions, ECF No. 36, PageID.254–255; Blood Pressure Readings, ECF No. 36-4, PageID.269–270.)  And Goins has had a blood pressure reading in the range of Stage 2 hypertension on at least three occasions in 2019 alone. (*See* Def.'s Resp. to Questions, ECF No. 36, PageID.256; Blood Pressure Readings, ECF No. 36-4, PageID.269–270.)  Goins contends that his hypertension places him at increased risk of death from COVID-19. (*See* Def.'s First Supp. Br., ECF No. 28, PageID.115–117.)

Second, Goins highlights that he has occasionally taken Prednisone to combat extreme pain that is caused by his degenerative disc disease and that cannot be managed by his daily pain medication. (*See id.*, PageID.117.)  Prednisone is a corticosteroid that suppresses Goins' immune system. (*See id.*)  Goins argues that his prolonged use of this corticosteroid is "a risk factor for death or serious illness from COVID-19." (*Id.*; *see also* Def.'s Resp. to Questions, ECF No. 36, PageID.256–257.)

Goins further argues that his hypertension and use of Prednisone place him at an especially high risk because he is currently incarcerated in a facility, FCI Elkton, that has experienced a serious outbreak in confirmed cases of COVID-19.  Several district courts have noted the severe situation at FCI Elkton. *See, e.g.*, *United States v. Brant*, No. 18-cr-20155, 2020 WL 2850034, at *2 (E.D. Mich. June 2, 2020) ("The

situation at FCI Elkton appears dire. . . . Currently, FCI has the second highest mortality rate in the BOP, behind only Fort Worth FMC . . . ."); *United States v. Brooks*, No. 07-cr-20047, 2020 WL 2509107, at *6 (C.D. Ill. May 15, 2020) ("FCI Elkton has shown an inability to successfully contain the outbreak thus far."); *Wilson v. Williams*, No. 20-cv-00794, 2020 WL 1940882, at *1–3 (N.D. Ohio Apr. 22, 2020) (outlining the ineffectiveness of FCI Elkton's procedures to address the COVID-19 outbreak).

The Government has submitted some evidence suggesting that the situation at Elkton may have improved somewhat over the past several weeks. For instance, the Government has presented data showing that the number of prisoners at Elkton hospitalized with COVID-19 has decreased over the last eight weeks. (*See* Gov't Second Resp., ECF No. 34, PageID.184.) The Government has also submitted evidence detailing the substantial steps that the staff at Elkton has taken to address the COVID-19 situation at that institution. (*See* Decl. of FCI Elkton Acting Associate Warden Andrea Burnside, ECF No. 34-2, PageID.193–203.) However, Goins has countered with evidence – including sworn declarations by public health medical experts – that the situation at Elkton remains "dire." (*See* Decl. of Meghan Novisky, PhD ¶ 4, ECF No. 35-1, PageID.234.) And as of June 8, 2020, there were 446 active cases of COVID-19 among FCI Elkton prisoners and 7 active cases

among staff, and 9 Elkton prisoners have died from COVID-19 so far. *See COVID-19 Cases*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus.

## II

## A

Section 3582(c)(1)(A) describes when a court may grant a prisoner compassionate release:

> [T]he court . . . may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

§ 3582(c)(1)(A).

The "applicable policy statements" mentioned in the statute are found in U.S.S.G. § 1B1.13. The comment to that section identifies the reasons for release that may rise to the level of "extraordinary and compelling":

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant.—

(i)     The defendant is suffering from a terminal illness (<u>i.e.</u>, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (<u>i.e.</u>, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)    The defendant is—

(I)     suffering from a serious physical or medical condition,

(II)    suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)     <u>Age of the Defendant</u>.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)     <u>Family Circumstances</u>.

      (i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

      (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)     <u>Other Reasons</u>.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

One district court has offered the following helpful explanation concerning how to apply the compassionate release statute in conjunction with the Sentencing Commission's guidance:

> [P]ursuant to the statutory directive in 18 U.S.C. § 3582(c)(1)(A) and in conjunction with the Sentencing Commission guidance provided in U.S.S.G. § 1B1.13, the Court must consider three issues in evaluating [a federal prisoner's] Compassionate Release application: (i) whether extraordinary and compelling reasons warrant a sentence reduction consistent with the Sentencing Commission's policy statement, (ii) whether [the prisoner] is "a danger to the safety of any other person or to the community," and (iii) whether the section 3553(a) factors "to the extent they are applicable," weigh in favor of a sentence reduction. *United States v. Bellamy*, 2019 WL 3340699, at *2 (D. Minn. July 25, 2019); [*United States v.*] *York*, 2019 3241166, at *5 [E.D. Tenn. July 18, 2019]; *United States v. Beck*, 2019 WL

11

> 2716505, at *7 (D.N.C. June 28, 2019); *United States v. Johns*, 2019 WL 2646663, at *3-4 (D. Ariz. June 27, 2019); [*United States v.*] *McGraw*, 2019 WL 2059488, at *3 [S.D. Ind. May 9, 2019].

*United States v. Wong Chi Fai*, No. 93-cr-1340, 2019 WL 3428504, at *2 (E.D.N.Y. July 30, 2019).

## B

"[S]everal courts have found an 'extraordinary and compelling reason' supporting release on the basis of a combination of dire prison conditions and underlying health conditions that increase the likelihood of severe illness from COVID-19." *United States v. Bass*, No. 10-cr-166, 2020 WL 2831851, at *7 (N.D.N.Y. May 27, 2020) (collecting cases). Such a combination exists here and warrants Goins' release.

As described in detail above, Goins has well-documented and persistent hypertension. Many district courts have recognized that hypertension increases the likelihood of severe complications from COVID-19. *See, e.g.*, *United States v. Foreman*, No. 19-cr-62, 2020 WL 2315908, at *2–4 (D. Conn. May 11, 2020); *United States v. Soto*, No. 18-cr-10086, 2020 WL 2104787, at *2 (D. Mass. May 1, 2020); *United States v. Sawicz*, No. 08-cr-287, 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020). So has the Secretary of the Department of Health and Human Services. *See* Kristen Holmes & Kevin Bohn, *Azar Lays Part of Blame for COVID-19 Death Toll on State of Americans' Health*, CNN (May 17, 2020),

https://www.cnn.com/2020/05/17/politics/us-health-conditions-coronavirus-alex-azar-cnntv/index.html (quoting Health and Human Services Secretary Alex Azar) ("[I]f we have hypertension, if we have diabetes, we present with greater risk of severe complications from corona – from this coronavirus.").

The Government counters that only pulmonary hypertension – not the general, non-pulmonary hypertension from which Goins suffers – presents an increased risk for COVID-19. (*See* Gov't Second Resp., ECF No. 34, PageID.182–183.)  There is some basis for this argument. *See Malam v. Adducci*, No. 20-10829, 2020 WL 2616242, at *4–5 (E.D. Mich. May 23, 2020) (considering the evidence that only pulmonary hypertension presents an increased risk for COVID-19, but ultimately concluding that a prisoner's non-pulmonary hypertension – in addition to her obesity – put her "at substantially heightened risk of severe illness and/or death from COVID-19").    Research about the relationship between non-pulmonary hypertension and COVID-19 continues to develop.[1] *See id.*  But at least three courts that have addressed this issue have concluded that non-pulmonary hypertension is a risk factor associated with severe COVID-19 outcomes. *See id.*; *Barbecho v. Decker*, No. 20-cv-2821, 2020 WL 2513468, at *3 (S.D.N.Y. May 15, 2020); *Foreman*, 2020 WL 2315908, at *4.  And in another case before this Court, an epidemiologist

---

[1] The Court will continue to consider motions from the parties regarding the link between non-pulmonary hypertension and COVID-19 as further research develops.

identified non-pulmonary hypertension as such a risk factor. *See* Aff. of Epidemiologist Katie Lin Brasher-Beaudry ¶ 2, *United States v. White*, No. 13-cr-20653-1, ECF No. 51-1, PageID.687 (E.D. Mich.) ("[T]he majority of credible data and research related to the relationship between hypertension and COVID-19 suggests that hypertension puts patients at a higher risk of becoming ill with COVID-19, experiencing severe symptoms, being hospitalized and/or dying."). The Court is persuaded that Goins' ongoing non-pulmonary hypertension – and the fact that his blood pressure remains high despite his use of medications – puts him at elevated risk of severe complications from COVID-19.

Moreover, Goins "is unable to provide self-care within the environment of" FCI Elkton because he "is unable to practice effective social distancing and hygiene to minimize [his] risk of exposure." *United States v. Colvin*, No. 19-179, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020). Goins' inability to provide self-care in FCI Elkton is especially important because the facility has had a serious outbreak of COVID-19 – there are currently 446 active cases of COVID-19 among FCI Elkton prisoners, 7 active cases among staff, and at least 9 prisoners have passed away due to COVID-19. The continued presence of the virus at the facility suggests it presents an ongoing risk, especially to vulnerable prisoners such as Goins. *See Bass*, 2020 WL 2831851, at *7 ("[T]he COVID-19 outbreak at FCI Elkton, in combination with

14

the special difficulty of social distancing in FCI Elkton's dorm-style environment, weighs heavily in the Court's analysis.").

Under these circumstances, Goins' non-pulmonary hypertension, in combination with the severe outbreak of COVID-19 at FCI Elkton, constitutes a serious medical condition, and that condition is an "extraordinary and compelling reason" warranting Goins' release. *See Foreman*, 2020 WL 2315908, at *2–4; *Soto*, 2020 WL 2104787, at *2–3; *Sawicz*, 2020 WL 1815851, at *2.

## C

For the reasons explained below (in the context of the Court's discussion of the Section 3553(a) factors), the Court concludes that releasing Goins would not pose a danger to the safety of the community or any of its members.

## D

The Court finds that releasing Goins would be consistent with the factors listed in 18 U.S.C. § 3553(a).

The nature and circumstances of Goins' offense are undoubtedly serious. *See* § 3553(a)(1). Goins posed a real danger to the community by selling heroin while armed. Thus, the nature of Goins' offense may weigh against granting compassionate release. But the remaining Section 3553(a) factors weigh in favor of compassionate release.

Goins' personal history and characteristics support release. Goins' most relevant personal characteristic is his vulnerability to COVID-19 due to his persistent hypertension and incarceration at FCI Elkton, and that vulnerability strongly supports release now. Moreover, while Goins' criminal history is not insignificant, he has taken substantial steps to improve himself and to position himself to avoid a return to crime if release. For instance, he has earned his GED while in custody and has completed many other BOP skill-building programs. (*See* Education Data, ECF No. 28-11, PageID.141.) Moreover, none of Goins' prior offenses involved the use of violence. Furthermore, there is an indication in the record that Goins' criminal history was driven, in part, by his addiction to, and abuse of, controlled substances (*see* Gov't Second Resp., ECF No. 34, PageID.189; citing PSR ¶¶ 62–70; *see also* Medical Records, ECF No. 37-2, PageID.339), and he has expressed an interest in obtaining intensive treatment (that has thus far been unavailable to him in the BOP) for his substance abuse issues. Finally, Goins continues to enjoy very strong family support, and his family has arranged for housing and employment upon his release. These personal circumstances and characteristics weigh in favor of release. *See* § 3553(a)(1).

Likewise, the goal of imposing sufficient punishment would be satisfied by releasing Goins. *See* § 3553(a)(2)(A). Goins has been in custody since 2011. He has served over 65% of the sentence formally imposed by Judge Battani and over

80% of the time in custody that the parties intended him to serve. He has already suffered meaningful and substantial punishment for his crimes. Moreover, Goins will suffer additional restrictions on his liberty through the home confinement condition that the Court will impose. Goins' time served plus the continued restrictions on his freedom of movement from the home confinement condition imposed by the Court, together, satisfy the goal of imposing sufficient punishment.

In addition, releasing Goins is consistent with the goal of deterrence. The substantial period of custody that Goins has served is sufficient to deter him from committing future offenses. That lengthy period of custody is also long enough to achieve general deterrence.

Next, releasing Goins to home confinement will not subject the public to a serious risk of harm. *See* § 3553(a)(2)(C). As described above, Goins appears to have improved himself and taken important steps to become a productive and law-abiding member of his community. Moreover, he has substantial family support that will help keep him on the right track. And the Court will require Goins, as a condition of his supervised release, to participate in substance abuse treatment as soon as he may safely do so (in light of the COVID-19 pandemic). Given Goins' self-improvement and his required participation in substance abuse counseling, the Court is persuaded that he will not pose a threat to the public upon release.

Furthermore, the most effective way to deliver medical care to Goins is outside of FCI Elkton where he can receive needed monitoring and treatment of his hypertension without facing an immediate threat of COVID-19. *See* § 3553(a)(2)(D). And while Goins has not been able to participate in substance abuse treatment while in custody (due to limited availability and the suspension of programming due to COVID-19), he should be able to commence such treatment in the community in the reasonably near future – and, at a minimum, sooner than he would be able to access such treatment in custody.

Finally, Goins' release will not produce an unwarranted sentencing disparity because it accounts for his unique medical circumstances. *See* § 3553(a)(6).

## III

Accordingly, for the reasons explained above, **IT IS HEREBY ORDERED** that Goins' Motion for Compassionate Release (ECF No. 23) is **GRANTED**.

The custodial portion of Goins' sentence is reduced to time served, and Goins shall be released from custody at FCI Elkton. Upon his release, Goins shall travel directly from FCI Elkton to the residence of Diana and Curtis Cann, and for fourteen days he shall remain quarantined in the bedroom of that home with the attached bathroom.[2]

---

[2] In other cases in which the Court has granted compassionate release, the Court has ordered that the defendant serve fourteen days in quarantine in his or her correctional facility before release. The Court declines to order quarantine here given the

Also upon Goins' release from custody, Goins shall begin serving the 36 months of supervised release that Judge Battani imposed in Goins' Judgment. (*See* Judgment, ECF No. 21, PageID.67.) The Court adds as a condition of that supervised release that for <u>six months</u> Goins shall be subject to home confinement at the Cann residence and shall not leave that residence other than for employment and/or job training, religious services, medical appointments, drug treatment programs, and appointments with counsel. In addition, Goins shall participate in substance abuse counseling as directed by the probation department and, if directed by that department, shall begin such counseling as soon as reasonably possible.

The Court will not order Goins to wear a GPS tether at this time due to the COVID-19 pandemic (and the Court's reluctance to subject the Court's probation officers to any risks associated with applying Goins' tether), but the Court will hold a telephonic status conference with counsel in sixty days to discuss whether to require Goins to wear a tether at that time. In all other respects, Goins' original sentence remains unchanged.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated: June 9, 2020          UNITED STATES DISTRICT JUDGE

---

circumstances at FCI Elkton and the Court's concern that quarantine at that facility would subject Goins to an unreasonable risk of COVID-19 infection. The Court concludes that ordering Goins to quarantine at the Cann residence as described above is sufficient to protect the health and safety of Goins, his family members, and the community.

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 9, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9761